# Composite Exhibit A-1

IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**
December 05, 2023 04:33 PM
ST-2023-CV-00439
TAMARA CHARLES
CLERK OF THE COURT



**Superior Court of the Virgin Islands**

| | | | | |
|---|---|---|---|---|
| **Case #** | ST-2023-CV-00439 | | **Citation #** | |
| **Case Title** | CD PARADISE HOLDINGS, LLLP v. Mushahwar et al | | **Judge** | Hon. Denise M. Francois |
| **Case Status** | Active | | **Case Status Date** | 12-05-2023 12:07 PM |
| **Receipt #** | 245493 | | **Receipt Date** | 12-05-2023 12:07 PM |
| **Payor** | Carol Ann Rich | | **Cashier** | ue |
| **Receipted** | $75.00 | | **Change Due** | $0.00 |

**Payment Methods**

| Method | Card Type | Reference # | Void | Amount |
|---|---|---|---|---|
| Online Payment | | 7d0eaa7b-2895-4634-843e-618dbcf2586d | | $75.00 |
| | | | | **$75.00** |

**Cost Types**

| Name | Assessment # | Starting Balance | Payment | Balance |
|---|---|---|---|---|
| Civil Complaint | 00282534 | $75.00 | $75.00 | $0.00 |
| | | **$75.00** | **$75.00** | **$0.00** |

**Assessment Items**

| Name | Assessment # | Starting Balance | Payment | Balance |
|---|---|---|---|---|
| Civil Complaint | 00282534 | $75.00 | $75.00 | $0.00 |
| | | **$75.00** | **$75.00** | **$0.00** |



**FILED**

December 05, 2023 12:07 PM
ST-2023-CV-00439
**TAMARA CHARLES**
**CLERK OF THE COURT**

**IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS & ST. JOHN**

| | | |
|---|---|---|
| CD PARADISE HOLDINGS, LLLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. ST-2023-cv-_____ |
| | ) | |
| STEPHEN ISA MUSHAHWAR, | ) | |
| PHILLIP G. CHESSON, CHESSON | ) | Action for Breach of Contract, |
| GROUP, LLC, NAHAKAMA, LLC, | ) | Debt, Fraud, Fraudulent Transfer, |
| NAHA HEALTH, LLC, ROBIN | ) | Unjust Enrichment, Alter Ego |
| CROSSMAN, GEORGE S. | ) | |
| BERNARDICH AND DEECHIE | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, CD Paradise Holdings, LLLP ("**CDPH**" or "**Plaintiff**"), files this Complaint against Defendants, Stephen Isa Mushahwar ("**Mushahwar**"); Phillip G. Chesson ("**Chesson**"); Chesson Group, LLC ("**Chesson Group**"); Nahakama, LLC ("**Nahakama**"); Naha Health, LLC ("**Naha**"); Robin Crossman ("**Crossman**"); George S. Bernardich ("**Bernardich**"); and Deechie Ventures, LLC ("**Deechie Ventures**") and alleges:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff CDPH is a Limited Liability Limited Partnership formed under the laws of the U.S. Virgin Islands, with its principal place of business in St. Thomas, Virgin Islands, which operates through its General Partner, CD Paradise Islands GP, LLC, a Virgin Islands limited liability company with members that are resident or organized under the laws of the U.S. Virgin Islands and the State of Florida. Dale Schmidt, as Trustee of the Cheryl Hagley Irrevocable Trust u/a/d 10/01/12, is the Managing Member of CD Paradise Islands GP.

2. CDPH is the victim of a complex, sophisticated, and carefully planned scheme orchestrated and devised by the Defendants to defraud CDPH out of millions of dollars under the guise of offering a series of "investments" through a complex fraudulent design. Defendants used shell companies to fraudulently transfer, disguise, and launder CDPH's investment funds.

3. Mushahwar is an individual resident and citizen of Pinellas County, Florida.

4. Chesson is an individual resident and citizen of Pinellas County, Florida.

5. Bernardich is an individual resident and citizen of Pinellas County, Florida.

6. Nahakama is a Florida Limited Liability Company with its principal place of business in Pinellas County, Florida. Nahakama was formed by Mushahwar and Chesson and is controlled by Mushahwar, Chesson, and Bernardich, who serves as Nahakama's secretary and treasurer.

7. Naha Health LLC is a Delaware limited liability company, registered to do business in the State of Florida, with its principal place of business in St. Petersburg, Florida. Naha Health is managed by Nahakama, LLC.

8. Chesson Group is a Florida Limited Liability Company with its principal place of business in Pinellas County, Florida, owned and controlled by Chesson.

9. Crossman is an individual citizen and resident of Pinellas County, Florida. Crossman was or is the CEO of Naha Health.

10. Deechie Ventures is a Florida Limited Liability Company with its principal place of business in Pinellas County, Florida, owned or controlled by Bernardich.

11. This Court has jurisdiction over this action under 5 V.I.C. § 76.

12. Venue is appropriate in this Court and this Division because the Plaintiff is a Virgin Islands LLLP based in St. Thomas. U.S. Virgin Islands, with members in both the Virgin Islands and Florida, and because the contracts and agreements under which these claims arise provide for application of the laws of the Virgin Islands and for venue in the courts of the Virgin Islands.

## FACTUAL ALLEGATIONS
### *The Introduction: Guardian and the Gold Claims*

13. Dale Schmidt, Managing Member of CDPH's General Partner, is a resident of St. Thomas, U.S. Virgin Islands. Prior to relocating to the Virgin Islands and forming CDPH in 2014, Schmidt was a resident of Florida where he spent decades building and operating a network of over 40 healthcare-related companies known as the "**Premier Family of Companies**."

14. On July 13, 2015, Chesson and Mushahwar formed Nahakama, LLC as a Florida limited liability company.

15. Shortly before they formed Nahakama, Mushahwar and Chesson introduced themselves to Schmidt as highly sought-after financial advisors with significant investment- banking experience and touted their supposed business experience and abilities to increase company values by reducing costs and maximizing revenue streams.

16. Mushahwar and Chesson advised Schmidt that Guardian Solutions Holding, LLC was an established I.T. company with significant growth potential that could help reduce the monthly I.T. costs for Schmidt's businesses and was an opportunity for the right investor, although at the time Mushahwar and Chesson made these representations Guardian did not yet exist.

17. Mushahwar and Chesson convinced Schmidt to use Guardian's IT services for his Florida companies and convinced CDPH to invest $1,500,000 for a 20% interest in Guardian.

18. Mushahwar and Chessen then used part of CDPH's "investment" in Guardian to fund the startup of their newly formed entity, Nahakama, and on information and belief, they spent the rest for their personal benefit.

19. At the same time as he was promoting Guardian, Mushahwar also urged CDPH to invest in certain allegedly lucrative gold mining opportunities. Mushahwar claimed to be an authorized representative of 535677 Yukon, Inc**.** (**"77Y"**) and 535720 Yukon, Inc. (**"20Y"**), the alleged owners of registered gold placer claims over certain property in the Yukon Territories in northern Canada (the "**Gold Claims**"). A placer claim grants the holder the right to extract a particular mineral from that certain property over which the claim applies, even though the holder may not necessarily be the owner of that property.

20. Mushahwar presented CDPH with certificates purporting to confirm the existence of 77Y and 20Y and the placer claims they owned and Mushahwar provided a technical report purportedly authored by a mining industry consultant and engineer, which stated that Gold Claims apply to real property estimated to contain a significant gold deposits, defined as "209.3 metric tons of gold."

21. Mushahwar claimed that an immediate investment would reap the best return because the gold market was going up.

22. On February 9, 2016, in reliance on Mushahwar's representations, CDPH, along with Gordian Gold Ltd., and Gordium Solutions Ltd. (British Virgin Islands entities formed by Schmidt), entered into an agreement with a group described as "**the SM Parties**," consisting of Mushahwar, Sask Commodities Corporation (Sask), 77Y, 20Y, and 4Pod

Global Limited (4Pod), to acquire the Gold Claims for $5,000,000.00, among other things, (the "**Purchase and Engagement Agreement**" or "**PEA**").

23. The PEA states that the Gold Claims were registered to 77Y and 20Y and had been or would be transferred to 4Pod, which would then transfer them to Sask and ultimately, upon payment of $5,000,000.00, to Gordian Gold.

24. The PEA also provided for Gordium Solutions to engage Mushahwar to assist it with securing financing through a standby letter of credit for the acquisition of an insurance company.

25. On February 12, 2016, and April 22, 2016, through two (2) separate transactions of approximately $2 million and $3 million, respectively, CDPH wired Mushahwar the total sum of $5 million to acquire the Gold Claims.

26. Unbeknownst to CDPH, Mushahwar never had an agreement for acquisition of the Gold Claims and did not use CDPH's $5 million to acquire the Gold Claims.

27. On information and belief, on or about May 2, 2016, Mushahwar and Chesson, through Nahakama, used $1,045 million of CDPH's funds to purchase a luxury home located at Lot 25, Block Q, A Replat of Tract "B" Tierra Verde Unit One, in Pinellas County Florida. Nahakama inserted Phillip Chesson's home address at 1471 Noell Blvd., Palm Harbor, FL 34683 Pinellas County, Florida, as grantee's address on the deed.

*Step Two: The Amended PEA and the 15 million Dollar Scheme*

28. On July 6, 2016, the parties executed Amendment No. 1 to the PEA (the "**Amended PEA**"). Nahakama was added to the SM Parties. The Amended PEA provided, in pertinent part, that:

a.  The SM Parties reaffirmed their obligations to CDPH under the original Purchase and Engagement Agreement;

b.  The agreement to acquire financing for the acquisition of an insurance company was terminated.  Instead, Mushahwar and the SM parties offered to issue CDPH (or its designee) shares representing a 35% ownership interest in Northwest Bankcorporation of Illinois, Inc. by no later than December 31, 2016 (the "**Bank Share Transfer**");

c.  CDPH agreed to provide a short-term loan of $15,000,000.00 to Mushahwar and the SM Parties, with a maturity date of December 31, 2016, for the exclusive purpose of facilitating the Bank Share Transfer (the "**Loan**").

d.  In the alternative, without limiting any other rights or remedies for failure to comply, if the SM Parties were unable to complete the Bank Share Transfer by December 31, 2016, the SM Parties would provide other compensation or equity of comparable value acceptable to CDPH.

A true and correct copy of the Amended PEA, which incorporates and reaffirms the original PEA, is attached hereto as **Exhibit 1**.

29. Mushahwar executed a promissory note (the "**Note**") in favor of CDPH in the principal amount of $15 Million Dollars, with a maturity date of December 31, 2016.   The Note provides for interest to accrue on the Note at the Interest Rate defined in the PEA, which is 4.5% per annum through December 31, 2016, and 12% per annum thereafter.   A true and correct copy of the Note is attached hereto as **Exhibit 2**.

30. Under the express terms of the Amended PEA, all of the SM parties, including Nahakama, agreed to be jointly and severally liable for performance of all of the obligations stated in the Note, although only Mushahwar signed the Note.

31. On July 6, 2016, CDPH wired $15 Million Dollars to Nahakama.

32. On August 19, 2016, Mushahwar and Chesson (through Nahakama LLC) entered into a three-year (3) lease to purchase agreement for another luxury home located at Lots 26 and 27, Block Q, A Replat of Tract "B" Tierra Verde Unit One, Fourth Replat, for an

initial payment of one million dollars. On information and belief, CDPH's funds were used to make the one million dollar initial payment.

33. On numerous occasions thereafter, Mushahwar repeatedly assured CDPH that the $15 million dollars in loan proceeds were on deposit with Nakahama in an escrow account pending completion of an acquisition in accordance with the Amended PEA.

34. As detailed below, Mushahwar and the SM Parties (which included Nahakama) failed to keep the $15 million in a separate escrow account. Instead, Mushahwar, Chesson, Nahakama, and the other Defendants conspired and cooperated to use CDPH's funds in a variety of schemes, including issuance of fraudulent and usurious loans, the purchase of valuable properties in Florida, and other ventures.

35. The SM Parties failed to complete the Bank Share Transfer or a comparable acquisition or to repay the Note by December 31, 2016, as required under the Amended PEA.

### Step Three: The Forbearance and the Concealment of the Fraud

36. In January of 2017, after the Note and Loan had matured, CDPH, requested repayment of the $15 million that was supposedly on deposit in escrow with Nahakama.

37. In response, Mushahwar assured CDPH that the monies were in escrow and had not been touched, and urged CDPH to forbear on collection because there were several new ventures and deals that were on the cusp of succeeding. CDPH agreed to allow the funds to remain in escrow, while the Note and Loan accrued interest at the Interest Rate of 12% per annum.

38. During 2017 and 2018, Mushahwar, Chesson, and Bernardich claimed that Nahakama was planning to acquire the Playhouse Theatre in St. Petersburg, Florida and that an

investment into this historical property, and subsequent renovations, could yield millions of dollars for CDPH in return.

39. When this investment did not materialize, Mushahwar and Chesson urged CDPH to forbear for a while longer, because they were on the ground floor of investing in and starting a new crypto-currency. During this time, the debt to CDPH continued to accrue interest at 12% per annum; and CDPH continued to forbear based upon the repeated re-affirmations of the obligation.

40. When the COVID-19 Pandemic hit in the Spring of 2020, Mushahwar and Chesson came up with a new scheme to conceal their fraud and hold off repayment to CDPH. This time they claimed that Nahakama's affiliate, Naha Health, was on the cusp of securing public healthcare management contracts with the states of Louisiana, Kentucky, and South Carolina and that the return on these lucrative contracts would be used to repay CDPH in full.

41. At this stage, Crossman entered the scheme as CEO of Naha Health and gave a presentation with brochures and charts to convince CDPH that Naha Health was about to secure a public health-care contract with the State of Louisiana.

42. Mushahwar supported Crossman's and Naha Health's claims with repeated assurances to CDPH by email, text, and phone calls that repayment of the 15 million Dollar Note, with interest, was imminent.

43. For example, on August 31, 2020, Mushahwar stated: *"We are moving forward to purchase CHS/South Carolina. I'm still on a conference we are still finishing the paperwork on the last deal and delivering another contract. My intention was to get*

*Mitch started today but I think it will be tomorrow. You and I are on the same page unless I'm missing something."* Text message attached as **Exhibit 3.**

44. In early September 2020, Mushahwar met with Schmidt and falsely claimed that Naha Health's Louisiana COVID-19 deal about to be signed and that they would receive a $40 million capital infusion. Mushahwar represented that his lawyers would put together documents confirming ownership of the Gold Claims, the escrow of the $15 million, and the other signed Naha Health contracts.

45. Throughout this time, Crossman continued, as the face of Naha Health, to mislead CDPH and to help in the scheme to conceal Mushahwar's sophisticated web of transactions designed to hide the improper use of CDPH's funds.

46. CDPH reasonably relied on the misrepresentations made by Crossman and Mushahwar on behalf of Nahakama and Naha Health.

47. Mushahwar used the passing of his accountant, Scott L. Rowan, as an excuse for the delay in putting together the documents that he had been promising CDPH for months.

48. The deception finally collapsed in July of 2022, when Schmidt received a subpoena for his testimony in a lawsuit pending in the Supreme Court of the State of New York, New York County, *Vision Biobanc Holdings Inc., v Naha Health LLC,* Case No 655433/2021 alleging that Mushahwar and his various business entities had engaged in loan sharking and fraud.

49. CDPH discovered that the $15 million loan and the $5 million paid for the Gold Claims was either squandered on the failing Nahakama or otherwise spent by Nahakama, Chessen, Chessen Group, Bernadich, and/or Deechie Ventures (in varying groupings) to

obtain valuable properties and to fund their fraudulent schemes and lavish personal lifestyles.

50. On information and belief, some of CDPH's funds were funneled by Nahakama to Deechie Ventures and other companies to purchase the following real properties:

I.      **Lots 26 and 27, Block Q, A Replat of Tract "B" Tierra Verde Unit One, Fourth Replat, according to the map or plat thereof as recorded in Plat Book 82, Pages 63 and 64, Public Records of Pinellas County, Florida.**
Parcel ID No. 19-32-16-90902-017-0260
a/k/a 774 Nina Dr., Tierra Verde, Florida, 33715-2038

II.     **Lot 13, Block 37, Tierra Verde Unit One, according to the Plat thereof, as recorded in Plat Book 57, on Pages 42 through 55, of the Public Records of Pinellas County, Florida.**
Parcel ID No. 17-32-16-90828-037-0130
a/k/a 804 3rd Ave S., Tierra Verde, FL

III.    **Lot 15, Block 3, Rouslynn, according to the plat thereof as recorded in Plat Book 1, Page 17, Public Records of Pinellas County, Florida.**
a/k/a 150 21ST AVE S. Saint Petersburg, FL
Parcel ID No. 30-31-17-77184-003-0150

(the "**Florida Properties**").

51. Mushahwar and Chesson, acting as Mushahwar's business manager, treasurer and secretary, along with Bernadich, acting as Mushawhar's CEO, and Bernadich's business entity, Deechie Ventures, diverted CDPH's funds to acquire the Florida Properties through shell companies they directly or indirectly owned or controlled.

52. The Florida Properties were then encumbered by mortgages and leases, which allowed Mushahwar, Chesson, Bernadich, and Deechie Ventures to obtain even more funds.

53. The Florida Properties were titled in the name of, and/ or the mortgages and leases were executed by, Mushahwar, Chesson, Bernadich, and/or Deechie Ventures.

54. On information and belief, Mushahwar, Chesson, and Bernadich also used CDPH's funds to purchase luxury vehicles and subsequently lease them to third-parties to acquire more funds.

55. CDPH did not discover these fraudulent transfers until after Mushahwar finally admitted to Schmidt in the July of 2022 that CDPH's $15 million loan was not and indeed never had been on deposit in a Nahakama escrow account.

56. This admission was a complete about-face from Mushahwar's prior, years' long representations and references to a Nahakama escrow account that contained CDPH's monies.

**COUNT I-DEBT AND BREACH OF CONTRACT FOR THE $15 MILLION DOLLAR NOTE AND LOAN -MUSHAHWAR AND NAHAKAMA**

57. CDPH realleges and incorporates paragraphs 1 through 56 above as if fully set forth herein.

58. Pursuant to the Amended PEA, CDPH agreed to lend the SM Parties, which included Mushahwar and Nahakama, $15 million, to be repaid pursuant to a duly executed promissory Note.

59. Mushahwar and Nahakama agreed to be jointly liable to CDPH for repayment of the $15 Million Dollar Note and Loan, with interest.

60. After the Note matured on December 31, 2016, Mushahwar for himself and on behalf of Nahakama, repeatedly reaffirmed the debt and the interest that was accruing and made continuous promises to perform under the Amended PEA and to repay the debt, which reaffirmations continued until at least July 2022.

61. Interest has accrued on the Note at the Interest Rate of 12% per annum since the maturity date of December 31, 2016.

62. As of June 30, 2023, the total amount due and owing to CDPH under the Note was **THIRTY MILLION TWENTY THREE THOUSAND NINE HUNDRED NINETY TWO DOLLARS ($30,023,992.00)** consisting of **$15,000,000.00** in principal and **$15,023,992.00** in interest. Interest continues to accrue at the rate of 12% per annum, (or the per diem rate of $4,931.50 until repayment in full, or entry of judgment.

63. Failure to repay the Note constituted a default under the terms of the Note.

64. Defendants' default under the Note has damaged CDPH by the loss of payments, interest, and other damages to be proved at trial.

   **WHEREFORE,** the Plaintiff, CD Paradise Holdings, LLLP, requests that the Court enter a judgment against the Defendants, Stephen Isa Mushahwar and Nahakama LLC, jointly and severally, awarding CD Paradise Holdings, LLLP the full amount due and owing under the Note ($30,0230,992.00) plus interest, attorneys' fees, and costs and costs of collection, along with post judgment interest at the maximum lawful rate and any other further relief to which Plaintiff may be entitled at law or in equity.

## COUNT II
### BREACH OF CONTRACT-THE $5 MILLION DOLLAR GOLD CLAIM - MUSHAHWAR AND NAHAKAMA

65. CDPH realleges and incorporates paragraphs 1 through 64 above as if fully set forth herein.

66. On July 6, 2016, the SM parties executed the Amended PEA.

67. The Amended PEA represented that the SM parties owned or controlled the Gold Claims, valued at not less than Five Million Dollars, and would cause the rights to the Gold Claims

to be transferred or assigned to CDPH or its designee, in exchange for payment of $5 million. CDPH paid the sum of $5 Million Dollars for the Gold Claims, and the payment of these funds required the SM Parties to perform their contractual duty to transfer the Gold Claims.

68. The SM Parties never transferred the Gold Claims.

69. The SM Parties breached the Amended PEA by failing to transfer the Gold Claims in exchange for the payment of $5 Million Dollars.

70. The SM parties breached the Amended PEA by failing to use CDPH's money to acquire title to the Gold Claims.

71. CDPH was directly and proximately damaged by the loss of its $5 Million payment without receiving the Gold Claims.

72. The Amended PEA provides that Mushahwar and Nahakama are jointly and severally liable to CDPH for performance of the Amended PEA, including the obligation to transfer the Gold Claims.

73. The Amended PEA provides for an interest rate on all obligations of 12% per annum.

74. Mushahwar and Nahakama are jointly and severally liable to CDPH for repayment of the sun of Five Million Dollars, plus interest at the rate of 12% per annum from December 31, 2016, to the date of repayment.

**WHEREFORE,** the Plaintiff, CD Paradise Holdings, LLLP, requests that the Court enter a judgment against Defendants Mushahwar and Nahakama, LLC for 5 Million Dollars, plus interest at the rate of 12% per annum, plus interest, attorneys' fees, and costs and costs of collection, along with post judgment interest at the maximum lawful rate and any other further relief to which Plaintiff may be entitled at law or in equity.

**COUNT III**
**FRAUD-MUSHAHWAR, CHESSON, CHESSON GROUP, NAHAKAMA, NAHA HEALTH, AND CROSSMAN, BERNADICH AND DEECHIE VENTURES**

75. CDPH realleges and incorporates paragraphs 1 through 74 above as if fully set forth herein.

76. Mushahwar and Chesson, directly and through Nahakama, represented to CDPH that they had the legal capacity and authority to obtain and transfer title of the Gold Claims valued at over Five Million Dollars to CDPH or its designee.

77. Mushahwar and Chesson, directly and through Nahakama, presented documents, brochures, registrations, expert reports, and other evidence designed to convince CDPH that they owned or controlled the Gold Claims and could transfer the rights to CDPH or its designee.

78. Mushahwar and Nahakama backed their claims with the commitments they made in the PEA and the Amended PEA.

79. Mushahwar's and Nahakama's representations to CDPH were both material to the contract and fraudulent.

80. CDPH reasonably relied on the representations, evidence, and contracts and, in reliance thereon, paid Five Million Dollars to Mushahwar and Nahakama for the Gold Claims.

81. Mushahwar and Nahakama never obtained title to the Gold Claims, but instead conspired with Chesson to use CDPH's funds for their own benefit and for the benefit of Nahakama and Chesson Group.

82. Mushahwar and Chesson, directly and through Nahakama, represented to CDPH that they had the ability to obtain shares in Northwest Bankcorporation of Illinois, Inc., or to invest in other valuable ventures.

83. Mushahwar and Nahakama backed their claims with the commitments they made in the PEA and the Amended PEA.

84. CDPH reasonably relied upon their representations and was induced to invest and did invest Fifteen Million Dollars, which was to be held in escrow until invested and which was to earn interest at the rate of 12% per annum.

85. When the initial investment did not materialize, Mushahwar, Chesson, and Nahakama were joined by Naha Health and Crossman in an elaborate scheme to show that Naha Heath was about to enter into valuable contracts, which would produce enormous returns on CDPH's investment.

86. Mushahwar, Chesson, and Nahakama continued to assure CDPH that the investment funds were safe in an escrow account and would be repaid in full with interest if the investments were not completed.

87. CDPH reasonably relied upon the representations by Mushahwar, Chesson, Nahakama, Naha Health, and Crossman, and agreed to forbear on seeking repayment of the $15 Million Dollar loan and the $ 5 Million Dollar investment in the Gold Claims.

88. Mushahwar, Chesson, Nahakama, Chesson Group, Bernadich, and Deechie Ventures conspired to divert, steal, and spend CDPH's funds to acquire valuable properties, fund business opportunities, and otherwise fund their luxury lifestyles.

89. CDPH did not discover the fraud and misuse of its funds until July of 2022, when Mushahwar finally admitted that there was no escrow account.

90. Mushahwar, Chesson, and Nahakama are jointly and severally liable for fraudulently inducing CPHD to invest a total of $20 Million Dollars.

91. Mushahwar, Chesson, Crossman, Nahakama, and Naha Health are all jointly and severally liable for fraudulently inducing CDPH to forbear from seeking repayment of the Note and Loan and the Gold Claim investment.

92. Mushahwar, Chesson, Nahakama, Chesson Group, Bernadich, and Deechie Ventures are all liable for diverting and stealing CDPH's funds, which were supposed to be held in escrow by Nahakama, and using those funds to invest in real properties, business ventures, and to fund their luxury lifestyles.

93. Mushahwar, Chesson, Nahakama, Chesson Group, Crossman, Naha Health, Bernadich, and Deechie Ventures are jointly and severally liable for all damages suffered by CDPH as a result of their participation in the fraudulent scheme in an amount to be determined.

94. The actions by Mushahwar, Chesson, Nahakama, Chesson Group, Crossman, Naha Health, Bernadich, and Deechie Ventures were willful, outrageous, and shock the conscience, such that each of them is liable to CDPH for punitive damages in an amount to be determined.

**WHEREFORE,** the Plaintiff, CD Paradise Holdings, LLLP, requests that the Court enter a judgment against Defendants Mushahwar, Chesson, Nahakama, Chesson Group, Crossman, Naha Health, Bernadich, and Deechie Ventures for all damages suffered by CDPH as a result of their participation in the fraudulent scheme, plus punitive damages, all in an amount to be determined, plus fees and costs, and any other further relief to which Plaintiff may be entitled at law or in equity.

**COUNT IV**
**FRAUDULENT TRANSFER /UNJUST ENRICHMENT/CONSTRUCTIVE TRUST - ALL DEFENDANTS**

95. CDPH realleges and incorporates paragraphs 1 through 94 above as if fully set forth herein

96. The Defendants have been unjustly enriched by intentionally, willfully, and knowingly receiving, converting, and stealing CDPH's investments of Five Million and Fifteen Million and using those funds for their own benefit or the benefit of the various business entities they own or control.

97. Defendants' use of CDPH's funds was unconscionable and unjust, and CDPH is entitled to the imposition of a constructive trust over the assets of each of the Defendants in an amount equal to the funds that were converted and stolen, plus interest, until all amounts due have been repaid in full.

**WHEREFORE,** the Plaintiff, CD Paradise Holdings, LLLP, requests that the Court enter a judgment against Defendants Mushahwar, Chesson, Nahakama, Chesson Group, Crossman, Naha Health, Bernadich, and Deechie Ventures imposing a constructive trust over all of their assets for all damages suffered by CDPH as a result of their participation in the fraudulent scheme, plus punitive damages, all in an amount to be determined, plus fees and costs, and any other further relief to which Plaintiff may be entitled at law or in equity.

**COUNT V**
**ALTER EGO/ PIERCING CORPORATE VEIL -NAHAKAMA, CHESSON GROUP AND DEECHIE VENTURES**

98. CDPH realleges and incorporates paragraphs 1 through 97 above as if fully set forth herein.

99. Mushahwar, Chesson, and Bernadich were the members, officers, and persons in control of Nahakama, Chesson Group, and Deechie Ventures.

100. Mushahwar, Chesson, and Bernadich used Nahakama, Chesson Group, and Deechie Ventures as undercapitalized shell companies to accomplish their fraudulent schemes.

101. Nahakama, Chesson Group, and Deechie Ventures did not operate as legitimate business ventures. These entities were created to perpetuate fraud and were undercapitalized or funded entirely with CDPH's investment funds.

102. Nahakama is the alter ego of Mushahwar, Chesson, and Bernadich.

103. Chesson Group is the alter ego of Chesson.

104. Deechie Ventures is the alter ego of Bernadich.

105. CDPH is entitled to judgment disregarding the corporate existence of Nahakama, Chesson Group, and Deechie Ventures and, instead, finding that each of the individuals and each of their shell companies are all jointly and severally liable for the conversion and fraudulent transfer of CDPH's funds, consisting of the Five Million and Fifteen Million Dollar investments, until all such amounts are repaid in full with interest.

**WHEREFORE,** the Plaintiff, CD Paradise Holdings, LLLP, requests that the Court enter a judgment against Defendants Mushahwar, Chesson, Nahakama, Chesson Group, Bernadich, and Deechie Ventures disregarding the corporate existence of Nahakama, Chesson Group, and Deechie Ventures and, instead, finding that each of the individuals and each of their shell companies are all jointly and severally liable for the conversion and fraudulent transfer of CDPH's funds, consisting of the Five Million and Fifteen Million Dollar investments, until all such amounts are repaid in full with interest, plus punitive damages, all in an amount to be determined, plus fees and costs, and any other further relief to which Plaintiff may be entitled at law or in equity.

**WHEREFORE**, Plaintiff CD Paradise Holdings LLLP prays for entry of Judgment against the Defendants Stephen Isa Mushahwar, Phillip G. Chesson, Chesson Group, LLC,

Nahakama, LLC, Naha Health, LLC, Robin Crossman, George S. Bernardich, and Deechie

Ventures, LLC, as follows:

A.      Under Count I for breach of contract and debt against Defendants Stephen

Isa Mushahwar and Nahakama LLC in the amount of $30,023,992.00, consisting of

**$15,000,000.00** in principal and $**15,023,992.00** in interest. Interest continues to accrue at

the rate of 12% per annum, (or the per diem rate of $4,931.50 until repayment in full, or

entry of judgment.

B.      Under Count II for breach of contract and debt against Defendants Stephen

Isa Mushahwar and Nahakama LLC in the amount of $5,000,000, plus interest, costs and

fees;

C.      Under Count III for compensatory and punitive damages for fraud against

all Defendants, jointly and severally in an amount to be determined;

D.      Under Count IV for fraudulent transfers, unjust enrichment and imposition

of a constructive trust against all Defendants in an amount to be determined;

E.      Under Count V, a judgment piercing the corporate veil of Defendants

Nahakama LLC, Chesson Group and Deechie Ventures and declaring said entities to be the

alter egos of Defendants Stephen Isa Mushahwar, Phillip G. Chesson, and George

Bernadich;

F.      An award of all of Plaintiff's costs and attorney's fees incurred in pursing

this action; and

G.      Such other and further relief as the Court deems just and appropriate.

**Jury Demand**
**Pursuant to V.I.R. Civ. P. 38 Plaintiff demands a trial by jury on all claims so**

**triable.**

Dated: December 5, 2023                    DUDLEY RICH LLP

BY:      */s/ Carol Ann Rich*
                         Carol Ann Rich, V.I. Bar No. 171
                         Gregory Adam Thorp, V.I. Bar No. 1117
                         5194 Dronningens Gade, Suite 3
                         St. Thomas, V.I. 00802
                         Telephone:  (340) 776-7474
                         Facsimile:  (340) 776-8044
                         Email: crich@dudleylaw.com
                                     athorp@dudleylaw.com

IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS



**FILED**
December 05, 2023 12:07 PM
ST-2023-CV-00439
**TAMARA CHARLES**
**CLERK OF THE COURT**

## AMENDMENT NO. 1
## TO
## PURCHASE AND ENGAGEMENT AGREEMENT

This Amendment No. 1 to the Purchase and Engagement Agreement (this "*Amendment*") is entered into as of July 6, 2016, and it amends the Purchase and Engagement Agreement dated as February 9, 2016, a copy of which is attached as <u>Exhibit A</u> and incorporated by reference (the "*Original Agreement*") and is entered into by and among:

(a)     The following "*SM Parties*": (i) **Stephan Mushahwar**, a Florida resident ("*SM*") and his affiliates, (ii) **Sask Commodities Corporation**, a Turks and Caicos corporation ("*Sask*"), (iii) **535677 Yukon Inc.,** a Yukon Territories corporation ("*77Y*"), (iv) **535720 Yukon Inc. .,** a Yukon Territories corporation ("*20Y*"), (v) **4Pod Global Limited**, a Belize entity ("*4Pod*"), and (v) Nahakama, LLC ("**Nahakama**"), and

(b)     The following "*Companies*" (and individually, a "*Company*"): (i) **Gordian Gold Ltd.**, a British Virgin Islands entity (the "*BVI GG Company*"), (ii) **Gordium Solutions Ltd.**, a British Virgin Islands entity (the "*BVI GS Company*"), and (iii) **CD Paradise Holdings LLLP**, a US Virgin Islands entity (the "*USVI Company*").

Defined terms used in this Amendment but not defined herein, have the meaning given them in the Original Agreement.

**Introduction:**

A.     Pursuant to the Original Agreement, (i) SM sold the GS Sold Units to the USVI Company representing a 10% interest in GS for the GS Sold Units Purchase Price of $35,000, (ii) SM caused the SM Parties to sell two Gold Claims to the BVI GG Company for the Gold Claims Purchase Price of $5,000,000, in each case subject to certain put and call options, and (iii) SM was engaged to assist the BVI GS Company is obtaining a Qualified Standby Letter of Credit for which SM, if all applicable conditions were met, would be eligible to receive the Engagement Consideration consisting of 50% of the of the Insurance Company Target.

B.     As of the date hereof, SM represents and warrants that he owns Units in GS representing a 30% interest in GS.

C.     Pursuant to an Option to Purchase Shares dated as of April 4, 2016 between Dale F. Schmidt and Nahakama (the "*Option to Purchase Shares*"), Nahakama was given an option to purchase 50% of the shares of the BVI GG Company and of the BVI GS Company.

D.     SM has requested that the USVI Company loan to SM $15,000,000 to be repaid with interest at the Interest Rate on or before the December 15, 2016 or the earlier applicable Expiration Date.

E.     In order to induce the USVI Company to make the Loan, the SM Parties are entering into this Agreement whereby, (i) the SM Parties will cause to be issued on or before the

**EXHIBIT 1**                    **CDPH-000001**

Expiration Date to an entity designated by the USVI Company (the "*Designee*") shares (the "*Bank HoldCo Incentive Shares*") representing a 35% ownership interest in Northwest Bankcorporation of Illinois, Inc. (the "*Bank HoldCo*"), whether or not the Loan is repaid and whether or not any put or call options are exercised, (ii) SM is selling to the USVI Company Units representing a 20% interest in GS for $70,000 (the "*Additional GS Sold Units Purchase Price*"), subject to certain puts and calls and subject to a waiver of any obligation of any of the Companies to pay the GS Sold Units Purchase Price or Additional GS Sold Units Purchase Price in cash, and (iii) the SM Parties are waiving any rights to acquire any equity interests in any of the Companies or their affiliates, subject only to possible Engagement Consideration, if any, under the Original Agreement.

**Amendment**:

1. **Loan**.

    a. **Loan**. The USVI Company hereby loans to the SM Parties the sum of $15,000,000 (the "*Loan*"), and the SM Parties, hereby jointly and severally agree to repay the Loan in full when due.

    b. **The Note**. The Loan will be evidenced by a Promissory Note issued by SM to the USVI Company in the form attached as Exhibit B (the "*Note*"), provided that the other SM Parties will be jointly and severally liable for the Loan even if not named in the Note.

    c. **Maturity**. The Loan will mature on the Expiration Date.

    d. **Interest**. Interest will accrue on the Loan at the Interest Rate.

    e. **Use of Proceeds**. The SM Parties may utilize proceeds of the Loan only in compliance with all applicable Laws and in a manner that will facilitate the issuance of the Bank HoldCo Incentive Shares to the Designee on or before the Expiration Date.

    f. **Repayment**. The Loan with interest is to be repaid in cash only, and not in kind, from funds duly available for such use. For clarity, issuance of the Bank HoldCo Incentive Shares does not constitute repayment of the Loan.

2. **Bank HoldCo Incentive Shares**.

    i. **Issuance**. Whether or not the Loan is or is not repaid and the Additional Call Option and/or Additional Put Option is or is not exercised, on or prior to the Expiration Date, the SM Parties agree to be caused to be issued to the Designee the Bank Holdco Incentive Shares. It specifically acknowledged that the Designee will be entitled to the Bank HoldCo Incentive Shares merely as a result of entering into this Amendment.

    ii. **Certain Agreements**. The SM Parties covenant, agree, represent and warrant that: (i) they will take, or cause to be taken, in compliance with all applicable Laws, such actions as may be necessary or appropriate to cause the

**EXHIBIT 1**            **CDPH-000002**

Bank HoldCo Incentive Shares to be issued to the Designee on or before the Expiration Date; (ii) the Bank HoldCo Incentive Shares will be issued to the Designee in compliance with all applicable Laws, including after obtaining any necessary or appropriate regulatory approvals; (iii) the Designee will not be required under applicable Laws to be deemed to be a bank holding company, nor be deemed to be part of a group acting in concert with any other stockholder of the Bank HoldCo or any other person; (iv) the Designee will have customary minority owner protections, as reasonably requested by the Designee, (v) no rights of first refusal, co-sale or similar restrictions on transfer will apply to the Bank HoldCo Incentive Shares; and (vi) other than the Designee, no person will have control over the voting of the Bank HoldCo Incentive Shares.

iii. **Alternative**. If for any reason the SM Parties are unable to comply with the foregoing provisions of this Section 2, without limiting any other rights or remedies that the Companies may have for such breach, the SM Parties will provide other compensation or equity to the Designee on or before the Expiration Date that is acceptable to the USVI Company that has at least the same value that the Bank HoldCo Incentive Shares would have had, all as reasonably determined by the USVI Company.

3. **Sale of Additional GS Sold Units**.

a. **Additional GS Sold Units**. In exchange for the Additional GS Sold Units Purchase Price payable by the USVI Company and the SM Parties' and CM's agreement to be bound by this Agreement, the SM Parties agree that SM is hereby selling and assigning good and marketable title in and to the Additional GS Sold Units to the USVI Company, free and clear of all Encumbrances.

b. **Waiver**. SM hereby waives any requirements that any Company pay the GS Sold Purchase Price or the Additional GS Sold Purchase Price in cash, it being acknowledged and agreed that SM has received equivalent value by the Companies entering into this Amendment. The foregoing will not reduce the applicable Option Prices as if such amounts had been paid in cash by the USVI Company.

c. **Limited Proxy**. Prior to the Expiration Date, SM will have a limited proxy to vote the Additional GS Sold Units (not the GS Sold Units) at a meeting of members of GS solely for matters involving the operation of GS in the ordinary course of business. Such proxy will terminate automatically on the Expiration Date.

d. **Additional Call Option**. Prior to the Expiration Date, the SM Parties will have the call option (the "*Additional Call Option*") to repurchase the Additional GS Sold Units from the USVI Company for the Additional GS Sold Units Option Price.

i. The Additional Call Option may be exercised only if the Call Option under the Original Purchase Agreement is being exercised by the SM Parties and the applicable consideration is paid thereunder, and the Loan is repaid in full.

**EXHIBIT 1**    **CDPH-000003**

ii. The Additional Call Option may be exercised by written notice to the USVI Company to the Expiration Date (and on the Expiration Date, the Additional Call Option will automatically terminate and the SM Parties will have no further rights with respect to the Additional GS Sold Units).

e. **Additional Put Option**. At all times from and after the Expiration Date, the USVI Company will have an ongoing put option with respect to the Additional Sold GS Units (the "*Additional Put Option*") to require the SM Parties, or any of them, to repurchase of the Additional GS Sold Units for the Additional GS Sold Units Option Price. The Additional Put Option may be exercised at any time by notice to SM, and upon such notice, SM agrees that the SM Parties will repurchase the Additional GS Sold Units.

f. **Closing**. The closing on the exercise of the Additional Call Option or an Additional Put Option will occur on a date selected by the USVI Company. On the closing date so selected, the SM Parties will be deemed in default thereof if either of them are not ready, able and willing to perform their obligations to repurchase the Additional GS Sold Units, including by being able to pay the Additional GS Sold Units Option Price in full and in immediately available funds. In exchange for payment at the closing in immediately available funds of the Additional GS Sold Units Option Price, the Additional GS Sold Units will be assigned "as is" by the USVI Company to SM.

g. **Additional GS Sold Units Option Price**. "*Additional GS Sold Units Option Price*" means an amount equal to the total of the following, as determined by the USVI Company:

i. the Additional GS Sold Units Purchase Price which is $70,000, <u>plus</u>

ii. interest on the Additional GS Sold Units Purchase Price at the applicable Interest Rate from and after the date hereof until payment in full of the Additional GS Sold Units Purchase Price, <u>plus</u>

iii. an amount sufficient, after taking into account any taxes payable upon receipt thereof (i.e., a grossed up amount), equal to the taxes payable in respect of any taxable income allocated by GS to the USVI Company with respect to the Additional GS Sold Units (and not any other GS Units of the USVI Company), net of any tax burden distributions, if any, received and retained by the USVI Company in respect thereof, <u>minus</u> (but not such that the Additional GS Sold Units Option Price would be reduced to less than $0)

iv. any non-tax burden distributions received and retained by the USVI Company with respect to the Additional GS Sold Unit (and not any other GS Units of the USVI Company).

h. **Call Option**. In addition to the other requirements applicable to the exercise of the Call Option under the Original Agreement, the Call Option may be exercised only if the Loan is repaid in full.

**EXHIBIT 1**      **CDPH-000004**

4. **Option to Purchase Shares**. The SM Parties, for themselves and their affiliates, agree that the Option to Purchase Shares is hereby terminated, and that they have no equity or rights to acquire equity in any of the Companies or their affiliates (other than any Engagement Consideration, if any, payable in accordance with the Original Agreement). While the Companies may consider granting an option in the future to SM or his affiliate if there is no Default and the plans presented to the Companies have been realized as presented, the Companies and their affiliates are no obligations to do so.

5. **SM Parties Representations and Warranties**. The SM Parties hereby represent and warrant to (and agree with) the Companies as follows (which representations and warranties will survive the consummation of the transactions contemplated hereby):

    a. **Original Agreement**. The representations and warranties set forth in the Original Agreement are hereby made again, and, as the context may require, references to the GS Sold Units will also be deemed to include the Additional GS Sold Units, as applicable.

    b. **Title**. SM is the sole record owners of the Additional GS Sold Units, and the Additional GS Sold Units represent a 20% ownership interest in GS. Upon execution of this Agreement, the USVI Company will be the sole beneficial and legal owner of the Additional GS Sold Units, and no other person will have any right, title or interest therein (except for the Additional Call Option subject to this Agreement), and each will have good and marketable title, free and clear of all Encumbrances. Under the Operating Agreement, as amended, of GS, the USVI Company will be admitted as a substitute member with respect to the Additional GS Sold Units and all of SM's rights with respect to such Additional GS Sold Units (including as to nondilution) will accrue to the benefit of and be enforceable by the USVI Company.

    c. **Disclosure**. All information provided by the SM Parties with respect to the transactions contemplated hereby is true, correct and complete. The SM Parties have not misrepresented any material fact, or omitted to disclose any material fact, related to the subject matter of this Amendment.

6. **Certain Additional Agreement.**

    a. **Confidentiality**. The SM Parties agree that no references will be made to any third party regarding the transactions contemplated by this Agreement without a Company's prior written consent.

    b. **Indemnity**. The SM Parties jointly and severally agree to indemnify and hold the Companies and their affiliates harmless from and against any Losses related to or arising out of:

        i. a Default,

        ii. any matter, fact, circumstance or event related to the Additional GS Sold Units first occurring or existing prior to the date hereof,

**EXHIBIT 1**        **CDPH-000005**

   iii. any matter related to the Bank HoldCo or its subsidiary(ies) or the issuance of the Bank HoldCo Incentive Shares, whether or not related to any action or inaction taken by any SM Party or by any other person; and

   iv. any Liabilities, taxes or violations of Law of or by any SM Party, or any affiliate thereof.

7. **General**.

  a. **Original Agreement**.  Except as amended and supplemented hereby, the Original Agreement continues in accordance with its terms. The SM Parties hereby ratify and confirm the terms of the Original Agreement, as amended hereby.  For clarity, references in the Original Agreement to "this Agreement" or similar terms means the Original Agreement as amended hereby.

  b. **Dale Schmidt**.  Dale Schmidt is not a party hereto and will not have any obligations hereunder, but is a third party beneficiary hereof and entitled to enforce the provisions hereof.

  c. **Notices**.  The address for notices to the Companies: is c/o CD Paradise Management, LLLP, 5326 Yacht Haven Grande, Suite K 206, St. Thomas, Virgin Islands 00802.

**EXHIBIT 1**   **CDPH-000006**

IN WITNESS WHEREOF, the undersigned have executed this **Amendment No. 1 to Purchase and Engagement Agreement** as of the date first set forth above.

_____
**Stephen Mushahwar**

**Sask Commodities Corporation**

By:_____
Its;_____Stephen I Mushahwar as its Agent_____

**535677 Yukon Inc.**

By:_____
Its;_____Stephen I Mushahwar as its Agent_____

**535720 Yukon Inc.**

By:_____
Its;_____Stephen I Mushahwar as its Agent_____

**4Pod Global Limited**

By:_____
Its;_____Stephen I Mushahwar as its Agent_____

**Nahakama, LLC**

By:_____
Its;_____Manager_____

- 7 -

**EXHIBIT 1**          **CDPH-000007**

**Gordian Gold Ltd.**

By: _____
Its; _____CEO_____

**Gordium Solutions Ltd.**

By: _____
Its; _____CEO_____

**CD Paradise Holdings LLLP**

By: _____
Its; _____CEO_____

**EXHIBIT 1**          **CDPH-000008**

**EXHIBIT A**

EXHIBIT 1        CDPH-000009

# PURCHASE AND ENGAGEMENT AGREEMENT

This Purchase and Engagement Agreement is made as of February 9, 2016 by and among

     (a)     The following "*SM Parties*": (i) **Stephan Mushahwar**, a Florida resident ("*SM*") and his affiliates, (ii) **Sask Commodities Corporation**, a Turks and Caicos corporation ("*Sask*"), (iii) **535677 Yukon Inc.,** a Yukon Territories corporation ("*77Y*"), (iv) **535720 Yukon Inc. .,** a Yukon Territories corporation ("*20Y*"), and (v) **4Pod Global Limited**, a Belize entity ("*4Pod*"), and

     (b)     The following "*Companies*" (and individually, a "*Company*"): (i) **Gordian Gold Ltd**., a British Virgin Islands entity (the "*BVI GG Company*"), (ii) **Gordium Solutions Ltd.,** a British Virgin Islands entity (the "*BVI GS Company*"), and (iii) **CD Paradise Holdings LLLP**, a US Virgin Islands entity (the "*USVI Company*").

## Introduction:

     A.     **GS Sold Units**.  SM is the record owner of 18 units in Guardedata, LLC, a Florida limited liability company doing business as Guardian Solutions ("*GS*"), for which SM made a cash capital contribution of USD$65,000 for all such units and which units represent an 18% interest in GS, and SM wishes to sell to the USVI Company 10 units in GS representing a 10% nondilutable interest in GS (the "*GS Sold Units*") for a purchase price equal to the cash contributions made by SM, or a net of USD$35,000 (the "*GS Sold Units Purchase Price*"), subject to certain put and call rights set forth below.

     B.     **Gold Claims**. 77Y and 20Y are the record owners of two gold mine placer claims (the "*Gold Claims*") for certain properties (the "*Properties*") located in the Yukon Territories, Canada, all as described on <u>Schedule A</u> which the SM Parties have represented have a value of at least USD$5,000,000; although not recorded, 77Y and 20Y have transferred their rights to the Gold Claims to 4Pod and 4Pod has transferred its rights to the Gold Claims to Sask; the SM Parties wish to assign the Gold Claims to the BVI GG Company for USD$5,000,000 (the "*Gold Claims Purchase Price*"), and the BVI GG Company is willing to so purchase the Gold Claims, subject to certain put and call rights set forth below.

     C.     **Qualified Standby LOC**.  The BVI GS Company is interested in acquiring a U.S. insurance company, but has not identified any target (any insurance company that the BVI GS Company, in its sole discretion elects to acquire, an "*Insurance Company Target*") and is interested in obtaining nonrecourse financing for such an acquisition, and SM has represented that he has experience is securing standby letters of credit suitable for financing 100% of the acquisition of Insurance Company Target, and based on such representation, the BVI GS Company is willing to engage SM to seek a Qualified Standby LOC (as below) on the terms set forth below.

**EXHIBIT 1**      **CDPH-000010**

**Agreement**:

1. **Sale of GS Sold Units and Gold Claims**.

    a.    **GS Sold Units**.  In exchange for the GS Sold Units Purchase Price payable by the USVI Company and the SM Parties' agreement to be bound by this Agreement, the SM Parties agree that SM is hereby selling and assigning good and marketable title in and to the GS Sold Units to the USVI Company, free and clear of all Encumbrances.

    b.    **Gold Claims**.  In exchange for the Gold Claims Purchase Price payable by the Gold Claims Purchase Price and the SM Parties' agreement to be bound by this Agreement, the SM Parties agree that the SM Parties are hereby selling and assigning good and marketable title in and to the Gold Claims to the BVI GG Company, free and clear of all Encumbrances.  The Gold Claims will also be deemed to include all books, records, files, reports, studies and other documents and information related to the claims referenced on <u>Schedule A</u> (the "*Gold Claims Documents and Information*").

    c.    **Payment**.  The GS Sold Units Purchase Price and Gold Claims Purchase Price will be paid to such persons or account(s) as directed by SM, and the SM Parties, as among them, will determine which SM Party is entitled to any payments with respect thereto (and the Companies will not have any obligations with respect thereto).

    d.    **Documents**. In connection with consummation of the above purchase transactions:

        i.    SM is delivering or causing to be delivered an Acknowledgment regarding assignability of Units in GS duly signed by all Members of GS, and an Assignment duly executed by SM.

        ii.    The SM Parties are causing be delivered duly executed Transfer of Placer Claims(s) or Interests therein and Statutory Declaration for Transfer of Mineral Claims duly executed by 77Y and 20Y (the "*Yukon Claim Transfer Documents*").

2. **Options for GS Sold Units and Gold Claims**.

    a.    **Call Option**. Prior to the Expiration Date, the SM Parties will have the call option (the "*Call Option*") to repurchase both the GS Sold Units from the USVI Company for the GS Sold Units Option Price and the Gold Claims from the BVI GG Company for the Gold Claims Option Price.

        i.    The Call Option may be exercised only in full as to both the GS Sold Units and the Gold Claims, and not separately as either or any such asset.

        ii.    Notwithstanding the foregoing, the BVI GG Company, in its sole discretion and by notice to SM, may elect to retain the Gold Claims

**EXHIBIT 1**                    **CDPH-000011**

notwithstanding the exercise of the Call Option by the SM Parties, in which case the Call Option will apply only to the GS Sold Units.

       iii.      The Call Option may be exercised by written notice to the USVI Company and to the BVI GG Company prior to the Expiration Date (and on the Expiration Date, the Call Option will automatically terminate and the SM Parties will have no further rights with respect to the GS Sold Units and the Gold Claims).

      b.      **Put Options**.  At all times from and after the Expiration Date, the USVI Company will have an ongoing put option with respect to the Sold GS Units, and the BVI GG Company will have an ongoing put option with respect to the Gold Claims (the "*Put Options*") to require the SM Parties, or any of them, to repurchase of the GS Sold Units and/or the Gold Claims for the GS Sold Units Option Price and/or (as applicable) the Gold Claims Option Price.

       i.      A Put Option may be exercised as to either or both of the GS Sold Units and/or the Gold Claims.

       ii.      A Put Option may be exercised at any time by notice to SM, and upon such notice, SM agrees that the SM Parties will repurchase the GS Sold Units and/or the Gold Claims, as applicable.

      c.      **Closing**.

       i.      The closing on the exercise of the Call Option or a Put Option will occur on a date selected by a Company.  On the closing date so selected, the SM Parties will be deemed in default thereof if either of them are not ready, able and willing to perform their obligations to repurchase the GS Sold Units and/or Gold Claims, as applicable, including by being able to pay the GS Sold Units Option Price and/or Gold Claims Option Prince in full and in immediately available funds.

       ii.      In exchange for payment at the closing in immediately available funds of the GS Sold Units Option Price and/or the Gold Claims Option Price, as applicable, the GS Sold Units and/or the Gold Claims, as applicable, will be assigned "as is" by the applicable Company to the applicable SM Party.

3.      **Engagement**.

      a.      **In General**. The BVI GS Company hereby engages (the "*Engagement*") SM on a non-exclusive basis to assist the BVI GS Company in obtaining a Qualified Standby LOC.

       i.      SM agrees to use best efforts to secure a Qualified Standby LOC, provided that the BVI GS Company is not obligated to pursue or use any letter of credit that might be or become a Qualified Standby LOC.

**EXHIBIT 1**      **CDPH-000012**

ii.     The Engagement will terminate on the Expiration Date, or if earlier, upon notice by the BVI GS Company to SM.

b.     **Certain Covenants**.  In connection with the Engagement, SM covenants and agrees that:

i.     He will provide such assistance in obtaining a Qualified Standby LOC and/or the acquisition of an Insurance Company Target as the BVI GS Company may request.

ii.     He will not take any action in connection with the Engagement with the BVI GS Company's approval and participation; without limiting the generality of the foregoing, he will not contact any potential standby letter of credit issuer, and will not provide any information regarding the BVI GS Company or its affiliates, or an Insurance Company Target, without the prior approval of the BVI GS Company in each instance.

iii.     If the Gold Claims have been pursuant to the terms of this Agreement, he will cause the SM Parties to pledge the Gold Claims at no additional cost to the BVI GS Company or its affiliates to secure the Qualified Standby LOC as requested by the BVI GS Company or the letter of credit issuer.

iv.     He will comply with all applicable Laws.

c.     **Conditional Engagement Consideration**.

i.     SM will be entitled to the Engagement Consideration as set forth below if and only if the following conditions are met (the "*Engagement Consideration Conditions*") (otherwise, SM and his affiliates will not be entitled to any consideration in connection with any insurance company acquisition by the BVI GS Company or its affiliates, or the financing thereof):

(1)     Prior to the Expiration Date, a Qualified Standby LOC is used by on behalf of the BVI GS Company to finance 100% of the acquisition price of an Insurance Company Target acquired and owned 100% by the BVI GS Company (and not its affiliates).

(2)     The SM Parties and their affiliates have met all of their obligations to the Companies under this Agreement and any other agreement to which any are parties to with any of the Companies or their affiliates.

(3)     The BVI GS Company and the regulators have determined that SM's ownership is acceptable for regulatory purposes.

(4)     SM pays one-half of all transaction costs, fees and other amounts incurred by the BVI GS Company or its affiliates in connection with the acquisition and financing of Insurance Company Targets

**EXHIBIT 1**                    **CDPH-000013**

(including amounts incurred to pursue acquisitions that were not consummated as well as the acquisition that is consummated) (collectively, "*Acquisition Costs*").

      ii.      If the above Engagement Consideration Conditions are met, the only consideration, if so payable, would be equity of the Insurance Company Target (or, at the BVI GS Company's option equity of the BVI GS Company that relates to the Insurance Company Target) with 50% owned by Dale Schmidt or his affiliates, and 50% by SM, provided that:

      (1)      Dale Schmidt or his affiliates will have control over the BVI GS Company and the Insurance Company Target notwithstanding such 50% ownership by SM,

      (2)      SM must execute such buy-sell, governance and other agreements related to the management and ownership of the BVI GS Company (and, as applicable, the Insurance Company Target) as the BVI GS Company may require.

      iii.      If the Engagement Consideration Conditions are not met, the BVI GS Company (or its affiliates) will be the sole owner directly or indirectly of the Insurance Company Target, and the BVI GS Company and its affiliates will have no duty or obligations to SM with respect to the Engagement:

      d.      **Partial Financing with Qualified Standby LOC**.  If the BVI GS Company, in its sole discretion, elects to use an otherwise Qualifying Standby LOC to finance less than 100%, but more than 75%, of the acquisition price of an Insurance Company Target, and the other requirements applicable to the Conditions and the terms of a Qualifying Standby LOC are met (other than the Qualifying Standby LOC being the sole source of financing), then the BVI GS Company may (but is not obligated to) offer SM the opportunity to make a cash co-investment in connection with the Investment Company Target acquisition for a portion of such equity investment, all as determined by the BVI GS Company in its sole discretion.

      4.      **SM Parties Representations and Warranties**. The SM Parties hereby represent and warrant to (and agree with) the Companies as follows (which representations and warranties will survive the consummation of the transactions contemplated hereby):

      a.      **Entities**. Each SM Party that is an entity is a duly formed, validly existing corporation in good standing under the Laws of jurisdictions set forth above, and is not required by applicable Law (including in Yukon Territories) to be qualified to do business in any other jurisdiction. Each such entity has all the requisite power, authority, and capacity to own, lease, and operate its assets and to carry on its business, and is not in default of its organizational document.

      b.      **Authority**.  Each SM Party has all power and authority to enter into and consummate the transactions contemplated by this Agreement. Each SM Party's execution, delivery, and performance of this Agreement and the consummation of the

**EXHIBIT 1**        **CDPH-000014**

transactions contemplated hereby have been duly authorized by all necessary action. This Agreement constitutes a legal, valid and binding obligation of each SM Party, enforceable against each SM Party in accordance with its terms.

c.      **No Violation**.  The execution, delivery, and performance by each SM Party of this Agreement do not: (i) violate any Law; (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license, instrument, or other material arrangement to which an SM Party is a party or by which an SM Party is bound or to which the assets of an SM Party are subject; or (iii) result in the creation of any Encumbrance on any assets of an SM Party.

d.      **No Consents**.  No Consent from any Person, including without limitation, any government entity, is required in connection with the execution, delivery, or performance of this Agreement by an SM Party, or the consummation by an SM Party of the transactions contemplated herein.

e.      **No Restrictions on Transfer**.  Other than the Operating Agreement, as amended, of GS, there are no voting trust agreements, powers of attorney, member agreements, proxies, or any other contracts to which an SM Party is a party, or by which an SM Party is bound relating to the sale, transfer, voting, registration, acquisition, distribution rights, or disposition of any of the GS Sold Units or the Gold Claims, or otherwise granting any person any right in respect thereof, and there are no existing restrictions on the transfer thereof.  Under the Operating Agreement, as amended, of GS, the USVI Company will be admitted as a substitute member with respect to the GS Sold Units and all of SM's rights with respect to such GS Sold Units (including as to nondilution) will accrue to the benefit of and be enforceable by the USVI Company.

f.      **Title**.  77Y and 20Y are the sole record owners of the Gold Claims, 77Y and 20Y have transferred, but not recorded, their rights to the Gold Claims to 4Pod and 4Pod has transferred, but not recorded, their rights to the Gold Claims to Sask.  No other person has any right, title or interest thereto.  The SM Parties have good and marketable title thereto, free and clear of all Encumbrances.  The Yukon Claim Transfer Documents are in form and content suitable for filing with the applicable Yukon governmental authorities, and upon such filing, the BVI GG Company will be the sole record owner of the Gold Claims, and no other documents or instruments are required for effecting the transfer of record title to the Gold Claims to the BVI GG Company.  The BVI GG Company will acquire good and marketable title, free and clear of all Encumbrances and Liabilities.  Upon execution of this Agreement, the USVI Company will be the sole beneficial and legal owner of the GS Sold Units, and no other person will have any right, title or interest therein (except for the Call Option subject to this Agreement), and each will have good and marketable title, free and clear of all Encumbrances.  Without limiting the generality of the foregoing, no other person has any written or oral agreement, option, understanding or commitment, or any right or privilege capable of becoming an agreement, for the acquisition of any interest in and to, or any rights to payments in respect of, any of the mineral property interests comprising the Gold Claims, and there is

- 6 -

**EXHIBIT 1**                              **CDPH-000015**

no adverse claim or challenge against or to the ownership of or title to any of the mineral property interests comprising the Gold Claims or which may impede their development, nor is there any basis for any such potential claim or challenge.  There are no claims or potential claims under any Laws affecting any of the mineral property interests comprising the Gold Claims.

g.      **No Orders**.  There are no outstanding orders or directions relating to environmental matters, health or safety requiring any work, repairs, construction or capital expenditures with respect to any of the mineral property interests comprising Gold Claims or the Properties, nor has any SM Party or its affiliates received any notice of same.

h.      **Maintenance Fees**.  All land and other maintenance fees for the Gold Claims have been paid in full when due.

i.      **No Liabilities**.  Other than with respect to taxable income allocated by GS with respect to the GS Sold Units in accordance with the terms of the [Operating Agreement] of GS, the Companies and their affiliates will not incur any Liabilities merely as a result of owning or holding the GS Sold Units or Gold Claims.  Without limiting the generality of the foregoing, the BVI GG Company and its affiliates will incur no Liabilities with respect to remediation, restoration or other environmental or health and safety matters with respect to or as a result of owning or holding the Gold Claims.

j.      **No Royalties**.  No person has any entitlement to any royalty or other payment on any minerals, metals or concentrates or any other such products removed from the Properties, and no person will be entitled thereto as a result of the consummation of the transactions contemplated hereby.

k.      **Status of Gold Claims**.  Each Gold Claim and Property is properly and accurately described in Schedule A.  Each Gold Claim has been properly located and recorded in the Yukon Territory and is in good standing under all applicable Laws, including, without limitation, with respect to the incurrence of any expenditures and the payment of any monies or taxes and will remain so until at least the date set out as the expiry date for the Gold Claims on Schedule A.  The value of the Gold Claims as of the date hereof is not less than the Gold Claims Purchase Price.

l.      **No Actions**.  There are no pending or outstanding or, to the best the SM Parties' knowledge, proposed, threatened or contemplated, Actions which, if successful, would or could affect the market value or ownership of the Gold Claims or the Property or any portion thereof.

m.      **Proceeds**.  The Purchase Price proceeds will be used solely by SM Parties for working capital for operating businesses, and will not be used in violation of any applicable Law.

n.      **Compliance**.  The Gold Claims are in compliance with all applicable Laws.  The condition on, and all activities related to, the Properties have been undertaken

**EXHIBIT 1**                    **CDPH-000016**

in any and all matters related thereto have been and are in compliance with all applicable Laws.

o.      **No Mining**.  No mining activities have taken place under or with respect to the Gold Claims or the Properties.

p.      **Taxes**.  No Company or its affiliates will be subject to taxation in Canada merely with respect to the holding or ownership of the Gold Claims.  No withholding is required under applicable Law for any payments made by a Company to an SM Party under this Agreement. No transfer taxes or other fees are payable with respect to the sale and assignment of the GS Sold Units or the Gold Claims, or the recording thereof.

q.      **Disclosure**.  All information provided by the SM Parties with respect to the Gold Claims is true, correct and complete.  The SM Parties have not misrepresented any material fact, or omitted to disclose any material fact, related to the subject matter of this Agreement.  True, correct and complete copies of all Gold Claims Documents and Information have been provided by the SM Parties to the Companies.

5.      **Certain SM Parties Covenants**. In addition to the other covenants and agreements set forth in this Agreement, the SM Parties covenant and agree that:

a.      **Record Title to Gold Claims**. At any time upon the request of the BVI GG Company, the SM Parties will cause at their expense the BVI GG Company to be reflected as the registered owner of the Gold Claims within five days after such request on all applicable registries or recordings, including any applicable to the ownership of placer gold claims under the Laws of the Yukon Territories, and will provide evidence thereof (including from applicable third parties) satisfactory to the BVI GG Company.

b.      **Gold Claims Renewal**.  The SM Parties further covenant and agree that on or before December 31, 2016 they will cause at their expense the Gold Claims to be renewed for a term of at least ten years after 2019.

6.      **Certain Definitions**.

a.      **Actions**.  "*Actions*" means any suit, claim, arbitration, mediation, investigation or proceeding, whether or not by or involving a governmental entity.

b.      **Confidential Information**.  "*Confidential Information*" means information regarding the terms of and transactions contemplated under this Agreement, and any nonpublic information with respect to the Companies or their affiliates, excluding any information that comes into the public domain after its disclosure through no violation of this Agreement.

c.      **Consents**.  "*Consents*" means any consent, license, permit, approval, registration, authorization or qualification filing of, from or with any governmental entity required under Law or from any third party required under any contract for the consummation of the transactions contemplated by this Agreement.

**EXHIBIT 1**                    **CDPH-000017**

d. **Default**. "*Default*" means the first to occur of:

   i.   the breach by an SM Party or its affiliates of this Agreement or any other agreement between an SM Party or its affiliates, on one hand, and the Companies or their affiliates, on the other hand,

   ii.   the death of SM, and

   iii.   the insolvency of any SM Party (however defined under applicable Laws, as determined by the BVI GS Company).

e. **Encumbrance**. "*Encumbrances*" means any mortgage, pledge, security interest, right of first refusal, option, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against the assignor, any filing or agreement to file a financing statement as debtor under applicable Law, or any subordination arrangement in favor of another person or any other impairment on title or ownership which otherwise could reduce the value of the asset related thereto.

f. **Expiration Date**. "*Expiration Date*" means the earliest to occur of:

   i.   December 31, 2016,

   ii.   the first date on which GS makes any distributions (other than tax burden distributions) with respect to the GS Sold Units,

   iii.   a Default.

g. **Gold Claims Option Price**. "*Gold Claims Option Price*" means an amount equal to the total of the following, as determined by the BVI GG Company:

   i.   the Gold Claims Purchase Price, plus

   ii.   interest on the Gold Claims Purchase Price at the applicable Interest Rate from and after the date hereof until payment in full of the Gold Claims Option Price, plus

   iii.   if not already paid by SM, one-half of Acquisition Costs (without duplication of amounts taken into account under Section 6.h.iii).

h. **GS Sold Units Option Price**. "*GS Sold Units Option Price*" means an amount equal to the total of the following, as determined by the USVI Company:

   i.   the GS Sold Units Purchase Price, plus

   ii.   interest on the GS Sold Units Purchase Price at the applicable Interest Rate from and after the date hereof until payment in full of the GS Sold Units Purchase Price, plus

**EXHIBIT 1**                    **CDPH-000018**

iii. if not already paid by SM, one-half of Acquisition Costs (without duplication of amounts taken into account under <u>Section 6.g.iii</u>), <u>plus</u>

iv. an amount sufficient, after taking into account any taxes payable upon receipt thereof (i.e., a grossed up amount), equal to the taxes payable in respect of any taxable income allocated by GS to the USVI Company with respect to the GS Sold Units (and not any other GS Units of the USVI Company), net of any tax burden distributions, if any, received and retained by the USVI Company in respect thereof, <u>minus</u> (but not such that the GS Sold Units Option Price would be reduced to less than $0)

v. any non-tax burden distributions received and retained by the USVI Company with respect to the GS Sold Unit (and not any other GS Units of the USVI Company).

i. **Interest Rate**. "*Interest Rate*" means an interest rate equal to 4.5% per year prior to the Expiration Date, and 12% per year from and after the Expiration Date.

j. **Laws**. "*Laws*" means any United States or foreign federal, state, territorial, provincial, or local law, statute, legislation, constitution, principle of common law, judicial decision, resolution, ordinance, code, judgment, order, decree, treaty, rule, regulation, ruling, determination, charge, direction, or other restriction of an arbitrator or government entity.

k. **Liability**. "*Liability*" or "*Liabilities*" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

l. **Losses**. "*Losses*" means any claim, Liability, obligation, loss, damage, demand, action, cause of action, assessment, judgment, deficiency, cost, penalty, fine, tax, Lien, or other expense (including, without limitation, reasonable attorney's and accountant's fees, costs, and expenses reasonably incurred in investigating, preparing, defending against, or prosecuting any litigation or claim, action, suit, proceeding, or demand).

m. **Qualified Standby LOC**. "*Qualified Standby LOC*" means a standby letter of credit with respect to which:

i. the BVI GS Company is the remitter and is issued to such recipient(s) as determined by the BVI GS Company in its sole discretion,

ii. is for up to USD $75 million and is used for the sole purposes of consummating the acquisition of an Insurance Company Target by the BVI GS Company,

iii.	is exclusively sourced by SM in accordance with the terms of this Agreement and SM provides material assistance in securing as requested by the BVI GS Company,

iv.	is issued by a bank acceptable to the BVI GS Company in its sole discretion (and without limiting the generality of the foregoing, which the BVI GS Company believes will be acceptable to and in fact is acceptable to applicable regulators),

v.	is the sole source of financing for the acquisition of the Insurance Company Target by the BVI GS Company (with no equity financing and no other debt financing to be provided by the BVI GS Company or its affiliates or third parties),

vi.	complies with all applicable Laws,

vii.	is acceptable to Insurance Company Target and its owner(s), and to applicable regulators,

viii.	no guaranties or other credit enhancements by the BVI GS Company or its affiliates other than the Gold Claims,

ix.	assets of the Insurance Company Target, if any, that will secure the standby letter of credit are limited to those that that will not create any adverse regulatory or financial implications (as determined by the BVI GS Company in its sole discretion),

x.	the maximum total all-in costs of the financing provided for or in connection with the letter of credit does not and will not exceed 10% per annum of the amount of the letter of credit (as determined by BVI GS Company, including, without limitation, all costs and fees in connection with obtaining the letter of credit and any interest on draws or advances thereunder or in connection therewith), and

xi.	is otherwise satisfactory to the BVI GS Company, in the BVI GS Company's sole discretion.

7.	**General**.

a.	**Further Assurances**.  In case at any time after the date hereof any further action is necessary to carry out the purposes of this Agreement, the SM Parties, at their cost, will take such further action, including the execution and delivery of such further instruments and documents, as the any other party reasonably may request, all at the sole cost and expense of either Company.

b.	**Confidentiality**. The SM Parties agree that the SM Parties and their affiliates will treat and hold as such all of the Confidential Information as confidential, refrain from using any of the Confidential Information except in connection with this

**EXHIBIT 1**	**CDPH-000020**

Agreement, and deliver promptly to either Company or destroy, at the request and option of either Company, all tangible embodiments (and all copies) of the Confidential Information that are in such party's possession.  In the event that any such SM Party or affiliate is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, SM will notify each Company promptly of the request or requirement so that a Company or its affiliates may seek an appropriate protective order or waive compliance with the provisions of this clause.  If such protective order is not obtained, or if and to the extent a Company or its affiliate waives such prohibition, an SM Party or its affiliate may make such legally compelled disclosure.

c.      **Indemnity**.  The SM Parties jointly and severally agree to indemnify and hold the Companies and their affiliates harmless from and against any Losses related to or arising out of:

i.      a Default,

ii.      any matter, fact, circumstance or event related to the GS Sold Units or the Gold Claim first occurring or existing prior to the date hereof, and

iii.      any Liabilities, taxes or violations of Law of or by any SM Party or affiliate thereof.

d.      **Assignment**. No SM Party may assign any of its rights or obligations under this Agreement without the consent of the Companies.  This Agreement may be assigned by a Company.

e.      **Severability.**  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance will be held to be prohibited by, illegal, or unenforceable under applicable Law or rule in any respect by a court of competent jurisdiction, such provision will be ineffective only to the extent of such prohibition, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

f.      **Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.   This Agreement represents the entire agreement among the parties regarding the subject matter hereof, and supersedes all prior negotiations and discussions, written or oral.

g.      **SM Parties.**  The obligations of the SM Parties are joint and several. Each person executing this Agreement on behalf of such SM Party represents and warrants that such person is duly authorized to execute this Agreement on behalf of such

**EXHIBIT 1**                    **CDPH-000021**

SM Party, and the applicable SM Party is legally bound hereby. The obligations of the Companies are several and not joint and several.

h. **Investigation**. A Company's or its affiliate's ability to seek indemnity will not be affected by any investigation, inquiry, knowledge, or examination (whether actual, constructive or imputed, or the lack of any the foregoing) by or on behalf of such party or its affiliates with respect to the accuracy or inaccuracy of or compliance with or performance of, any representation, warranty, covenant, agreement or obligation.

i. **Remedies.** Except as expressly provided in this Agreement, any person having any rights under any provision of this Agreement will be entitled to seek to enforce such rights specifically (without posting a bond or other security), to recover Losses by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law. Except as expressly provided in this Agreement, all such rights and remedies will be cumulative and non-exclusive, and may be exercised singularly or concurrently. The parties acknowledge that any breach of this Agreement may cause substantial irreparable harm to the other party. Therefore, this Agreement may be enforced in equity by an action for specific performance, temporary restraining order, and/or injunction. The rights to such equitable remedies will be in addition to all other rights or remedies that a party may have under this Agreement or under applicable Law.

j. **Consent to Amendments; Waivers.** This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by the parties. No course of dealing between or among the parties hereto will be deemed effective to modify, amend, or discharge any part of this Agreement, or any rights or obligations of any such party or such holder under, or by reason of, this Agreement.

k. **Notices.** All demands, notices, communications, and reports provided for in this Agreement will be in writing and will be sent by facsimile with confirmation to the number specified below, personally delivered, or sent by reputable overnight courier service (delivery charges prepaid), or by registered or certified mail, postage prepaid, return receipt requested, to any party at the address specified below, or at such address, to the attention of such other person, and with such other copy, as the recipient party has specified by prior written notice to the sending party pursuant to the provisions of this clause. All notices, demands, and other communications hereunder may be given by any other means (excluding electronic mail), but will not be deemed to have been duly given unless and until it is actually received by the intended recipient.

To an SM Party:

Stephen I Mushahwar
804 3rd Ave S
Tierra Verde, FL 33715

To a Company:

**EXHIBIT 1**                    **CDPH-000022**

CD Paradise Holdings LLLP
One Hibiscus Alley
5093 Dronningens Gade,
St. Thomas, USVI  00802


with a copy to (which will not constitute notice to a Company):

Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Attn:  Simon C. Root
Fax:  (612) 492-7077


l.      **Governing Law; Forum.**  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the Schedules and Exhibits hereto will be governed by, and construed in accordance with, the Laws of the U.S. Virgin Islands without giving effect to any choice of law or conflict of law rules or provisions (whether of the U.S. Virgin Islands or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the U.S. Virgin Islands.  Any judicial proceeding brought with respect to this Agreement must be brought in any court of competent jurisdiction in the U.S. Virgin Islands, and, by execution and delivery of this Agreement, each party (i) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and (ii) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum.  Each party agrees to accept service of process pursuant a notification sent in compliance with this Agreement. Nothing in this clause, however, will affect the right of any party to serve legal process in any other manner permitted by law or at equity.  Each party agrees that, subject to the limitations contained herein, a final judgment in any action or proceeding so brought will be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.  Notwithstanding the foregoing, at the Companies' option on written notice to SM, references to the U.S. Virgin Islands in this clause may be changed to the State of Florida.

m.      **WAIVER OF JURY TRIAL.**  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES AND COVENANTS THAT NONE OF THE PARTIES HERETO OR THEIR AFFILIATES WILL ASSERT ANY RIGHT TO TRIAL BY JURY ON ANY ISSUE IN ANY PROCEEDING, WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE, IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH, RELATED, OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HEREUNDER, IN EACH CASE WHETHER NOW

**EXHIBIT 1**                                      **CDPH-000023**

EXISTING OR HEREAFTER ARISING, AND WHETHER IN TORT OR CONTRACT OR OTHERWISE.

[Signature lines next page]

**EXHIBIT 1**                    **CDPH-000024**

IN WITNESS WHEREOF, the undersigned have executed this **Amendment No. 1 to Purchase and Engagement Agreement** as of the date first set forth above.

_____
**Stephen Mushahwar**

**Sask Commodities Corporation**

By:_____
Its;  Stephen I Mushahwar as its Agent

**535677 Yukon Inc.**

By:_____
Its;  Stephen I Mushahwar as its Agent

**535720 Yukon Inc.**

By:_____
Its;  Stephen I Mushahwar as its Agent

**4Pod Global Limited**

By:_____
Its;  Stephen I Mushahwar as its Agent

**Nahakama, LLC**

By:_____
Its;  Manager

**EXHIBIT 1**          **CDPH-000025**

**Gordian Gold Ltd.**

By: _____
Its; _____C E O_____

**Gordium Solutions Ltd.**

By: _____
Its; _____C E O_____

**CD Paradise Holdings LLLP**

By: _____
Its; _____C E O_____

**EXHIBIT 1**          **CDPH-000026**

**Schedule A**

**Gold Claims; the Properties**

The Claims are referenced as:

1. A mineral claim of in situ gold reserves located near Burwash Landing, Yukon Territory, Canada, registered in the Yukon Claims Registry as Claim Type Placer, Claim District Whitehorse, Claim JBSH, Claim Number 4, Grant Number P03918.
2. A mineral claim of in situ gold reserves located near Burwash Landing, Yukon Territory, Canada, registered in the Yukon Claims Registry as Claim Type Placer, Claim District Whitehorse, Claim JBSH, Claim Number 5, Grant Number P03919.

The Properties are all real properties related thereto.

**EXHIBIT 1**            **CDPH-000027**

**EXHIBIT B**

**EXHIBIT 1**   **CDPH-000028**

$15,000,000                                                          July 6, 2016

## Promissory Note

FOR VALUE RECEIVED, **Stephen Mushahwar** (the "Borrower") promises to pay to the order of **CD Paradise Holdings, LLLP** at its office in the U. S. Virgin Islands, or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of **Fifteen Million Dollars (USD$15,000,000)**, together with interest at the applicable Interest Rate from and after the date hereof until this Note is fully paid on the unpaid principal balance from time to time.

This Note is issued pursuant to that certain Purchase and Engagement Agreement dated as of February 9, 2016, as amended by Amendment No. 1 thereto dated as of July 6, 2016 (as amended from time to time, the "Agreement"), and is entitled to the benefit thereof. Defined terms used in this Note but not defined herein have the meaning given them in the Agreement.

This Note with interest is due in full on the earlier of December 31, 2016 or the applicable Expiration Date.

The Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note, without premium or penalty. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principa.

Borrower agrees to pay all costs of collection, including attorney's fees, in the event this Note is not paid when due. Demand, presentment, protest and notice of nonpayment and protest are hereby waived by Borrower.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by as of the date first set forth above.

_____
**Stephen Mushahwar**

**EXHIBIT 1**                                          **CDPH-000029**

IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**
December 05, 2023 12:07 PM
ST-2023-CV-00439
TAMARA CHARLES   000
CLERK OF THE COURT



July 6, 2016

## Promissory Note

FOR VALUE RECEIVED, **Stephen Mushahwar** (the "Borrower") promises to pay to the order of **CD Paradise Holdings, LLLP** at its office in the U. S. Virgin Islands, or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of **Fifteen Million Dollars (USD$15,000,000)**, together with interest at the applicable Interest Rate from and after the date hereof until this Note is fully paid on the unpaid principal balance from time to time.

This Note is issued pursuant to that certain Purchase and Engagement Agreement dated as of February 9, 2016, as amended by Amendment No. 1 thereto dated as of July 6, 2016 (as amended from time to time, the "Agreement"), and is entitled to the benefit thereof. Defined terms used in this Note but not defined herein have the meaning given them in the Agreement.

This Note with interest is due in full on the earlier of December 31, 2016 or the applicable Expiration Date.

The Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note, without premium or penalty. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principa.

Borrower agrees to pay all costs of collection, including attorney's fees, in the event this Note is not paid when due. Demand, presentment, protest and notice of nonpayment and protest are hereby waived by Borrower.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by as of the date first set forth above.

_____
**Stephen Mushahwar**

**EXHIBIT 2**        **CDPH-000030**

FILED

December 05, 2023 12:07 PM
ST-2023-CV-00439
TAMARA CHARLES
CLERK OF THE COURT



**EXHIBIT 3**          **CDPH-000031**